NYE-SCHNEIDER-FOWLER GRAIN COMPANY, APPELLANT, V. MICHAEL HOPKINS ET AL., APPELLEES.

FILED JUNE 18, 1915. No. 18126.

Deeds: BREACH: REVERSION. A subsidiary corporation of a railroad company was the owner of land suitable for an elevator site adjacent to the tracks of the railroad company. The land was conveyed to a grain company without other consideration than a written contract, wherein it was provided that the grain company should build and operate a grain elevator thereon, the railroad company to furnish a "free in-switch" thereto, and in case of the destruction of the elevator by fire, or otherwise, the grain company should rebuild within a reasonable time, and on failure so to do title should revert to the grantor. The elevator was destroyed by fire April 3, 1910. Prior to July 27, 1911, the grain company had taken no steps toward rebuilding, nor did it then show an unqualified intention to rebuild. *Held*, that the title to the land reverted to the grantor.

APPEAL from the district court for Douglas county: HOWARD KENNEDY, JUDGE. *Affirmed.*

*Courtright & Sidner*, for appellant.

*William Baird & Sons* and *Ralph M. Shaw, contra.*

MORRISSEY, C. J.

This action is brought by plaintiff to quiet the title to the real estate involved, an elevator site in the city of Omaha, and to remove clouds from the title. The defendant Hopkins, together with several other defendants, made default, and a decree was entered against them, but the

Chicago Great Western Railroad Company and its subsidiary corporations, the Mason City & Fort Dodge Railroad Company and Omaha Grain Terminals, filed answers and cross-petitions, and from a decree in favor of these corporations plaintiff appeals.

The Chicago Great Western Railroad Company owns all of the stock of the Mason City & Fort Dodge Railroad Company, which in turn owns all of the stock of the Omaha Grain Terminals. The case appears to have been tried on the theory that the subsidiary corporations were not bound by the acts of the parent corporation. But this theory is abandoned in this court, and it is admitted that the real controversy is between the plaintiff company, which, so far as this property is concerned, has succeeded to the rights and interest of the Nye-Schneider-Fowler Company, and the Chicago Great Western Railroad Company, which represents the interests of itself and its subsidiary corporations. Prior to March, 1906, the title stood in the Omaha Grain Terminals. The Chicago Great Western Railway Company has since been reorganized, and is now doing business under the name of Chicago Great Western Railroad Company, and is the real defendant herein. The plaintiff, Nye-Schneider-Fowler Grain Company, is a subsidiary corporation of Nye-Schneider-Fowler Company. For many years this latter company has been engaged in the grain business, and in 1906 it was desirous of securing terminal facilities in the city of Omaha. The Chicago Great Western Railway Company was desirous of securing the business of this grain company, and an agreement was made whereby the terminals company conveyed by deed, absolute in form, the land involved herein to the grain company, but at the same time a contract was made and entered into between the parties, whereby the grain company agreed to erect, maintain and operate a grain elevator, with a minimum capacity of 750,000 bushels, upon the land conveyed, and the railroad company agreed to furnish a "free in-switch" as long as the elevator should be operated by the contracting grain company, or any com-

98 Neb. 33

pany controlled by it, but no longer, and the grain company agreed that, should the elevator be destroyed by fire, or otherwise, it would rebuild the same within a reasonable time, or, failing to thus rebuild, reconvey the real estate to the grantor. The elevator was built according to the agreement, and operated until April, 1910, when it was burned. There was a great quantity of grain in the elevator at the time of the fire, and this continued to burn for several months. Plaintiff took no immediate steps toward the reconstruction of the elevator, but during the summer succeeding the fire there was correspondence between the real parties in interest herein, which shows that the railroad company was desirous of having plaintiff continue to do business over its lines, but that it was anxious to be freed from its contract to furnish a "free in-switch." The matter ran along in an unsettled way until July, 1911, when a new memorandum agreement was drawn up and O. K.'d by Mr. Fowler, acting for the plaintiff company, and Mr. Somers, the general freight agent of the railroad company. We think it must be admitted that plaintiff had forfeited the title under the terms of the contract made in March, 1906, but plaintiff contends that the effect of the July, 1911, memorandum is to cancel in all respects the contract of March, 1906, which required plaintiff to rebuild within a reasonable time, or, on failure so to do, to reconvey the title. The July memorandum was designed to give plaintiff a lease upon a grain elevator owned by one of the railroad company's subsidiary corporations, and plaintiff relinquished all rights to a "free in-switch," and the land in controversy was to be freed from the provisions of the March, 1906, contract. Nine days later Mr. Somers, the freight agent, wrote plaintiff that he had exceeded his authority in attempting to bind the subsidiary corporations, as he was not one of their officers, and submitted two counter propositions, which related to the leasing of the elevator controlled by defendant and the relinquishment of plaintiff's rights under the agreement of March, 1906. He also expressed the hope that at the termination of the lease for the elevator plaintiff would either

rebuild on its old site, or that the relations between the parties would be such that a renewal lease for the elevator might be made, and asked an acquiescence in the proposed modifications. Without waiting for a reply, the railroad company on the following day issued its new tariff providing for an in-switching charge.

The original conveyance was made to plaintiff for the purpose of having grain elevators built in order that the railroad company might get the freight resulting therefrom. The correspondence shows that after the fire the railroad company desired to have the elevator rebuilt, but it shows also that the railroad company was complaining of the burden which the "free in-switching" clause of the contract placed upon it, and was desirous of being relieved from this burden. On the other hand, the record discloses a disposition on the part of the plaintiff to defer the erection of a new elevator, and, perhaps, a desire to take over an existing elevator in order that it might thereby eliminate a competitor. Mr. Fowler, who is shown to have absolute authority in the management of plaintiff's business, was examined as a witness, and when questioned as to the intention of himself or company to rebuild said: "I intended to rebuild unless certain matters that were affecting the Omaha market went adversely." This does not state an unqualified intention of rebuilding. Being further interrogated on the subject, he said: "A. Why, briefly, at that time we had one proposition before us for the purchase of a large elevator plant at practically half its cost, and another smaller one on a very reasonable basis; and it showed itself whereby we might be able to decide to let the Omaha Grain Terminals investment go, that land, and take on the other plant at a very profitable basis, and reduce the elevator facilities competing with us one plant. And, as a result, I was putting off our decision, any decision on our rebuilding, that is, open statement that we would rebuild, as long as possible." This demonstrates that plaintiff was awaiting future developments before making a decision as to whether it would abandon the real estate or whether it would rebuild, and,

in view of the fact that the elevator burned in April, 1910, and no step was taken toward its reconstruction when the memorandum of July 27, 1911, was made, we reach the conclusion that plaintiff had forfeited its right to the real estate, and, unless the memorandum of that date is a valid and enforceable contract, plaintiff must be held to have no interest in the real estate. The trial court found that the memorandum of July 27 was not a contract, but only a memorandum of the different propositions proposed by the parties. In entering the decree the court said: "It indicates on its face that it is not a completed contract. Certain things are proposed, certain steps are left to be decided in the future; if necessary this and that is to be done. 'These details will be worked out in an amicable way fair to both.' 'The second party will take care of all minor matters relating to the corporation.' All the way through, it seems to me, it indicates that it is rather tentative than final in its nature." And in this conclusion we are constrained to believe the trial court is correct. The memorandum never was carried out in its entirety. On August 8 plaintiff was notified that defendant was not bound by paragraph 2 thereof, which was in effect a repudiation of the whole memorandum and the submission of a counter proposal.

It is apparent that plaintiff did not rebuild within a reasonable time, and the evidence on its behalf does not indicate any present intention to rebuild. On the facts and evidence, we believe the trial court was warranted in granting the prayer of defendant's cross-petition and quieting the title as therein prayed.

The judgment of the district court is

AFFIRMED.

LETTON, ROSE and HAMER, JJ., not sitting.